1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

NORTHWESTERN UNIVERSITY, an
Illinois not-for-profit corporation,

                Plaintiff,

    v.

KING COUNTY,

                Defendant.

No. 2:20-cv-1043

COMPLAINT FOR FALSE DESIGNATION
OF ORIGIN, UNFAIR COMPETITION &
COMMON LAW TRADEMARK
INFRINGEMENT

For its claims against Defendant King County, Plaintiff Northwestern University

("Northwestern") states as follows:

## I.    INTRODUCTION

For over 25 years, Northwestern's Children and Family Justice Center ("CFJC") has

advocated for the rights of children and their families throughout the United States, providing

comprehensive legal services and fighting strenuously against youth detention.  Over

Northwestern's objection, King County named its new juvenile detention facility the "Children

and Family Justice Center," or the "CFJC."  Northwestern's ongoing efforts to avoid litigation

failed after King County refused to even consider changing the name of its new youth detention

facility.  Northwestern now seeks to force King County to call this new facility something else.

COMPLAINT – 1

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

## II.      PARTIES, JURISDICTION, AND VENUE

1.      Plaintiff Northwestern University is a private, not-for-profit, nonsectarian, coeducational institution, created by Charter by the State of Illinois in 1851 and located in Evanston, Illinois.

2.      Defendant King County is a subdivision of the State of Washington, located in this District.

3.      Jurisdiction of this Court is based on 28 U.S.C. § 1338(a) and (b) (acts of Congress pertaining to trademarks and related actions), 15 U.S.C. § 1121 (Lanham Act), 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1367 (supplemental jurisdiction), as well as the principles of pendent jurisdiction.

4.      This Court has personal jurisdiction over Defendant and venue is proper because Defendant resides, conducts business, and has infringed and is infringing the CFJC's intellectual property in this District.

## III.      FACTS AND BACKGROUND

**Northwestern's CFJC, Its Services, and Its Trademark Rights**

5.      The Bluhm Legal Clinic is the clinical legal program at Northwestern Pritzker School of Law, one of the professional graduate schools of Northwestern.  Housing more than 20 different clinics within 13 centers, the Bluhm Legal Clinic offers one of the most diverse and comprehensive programs among the nation's law schools.  It is internationally recognized for its legal reform work and for contributing to a skilled, ethical, and public-spirited legal profession integral to a society that values and promotes justice.

6.      The CFJC is one of the Bluhm Legal Clinic's centers.  Founded in 1992, the CFJC is a comprehensive children's law office.  Information on the CFJC, its programs, and its services can be found at http://www.law.northwestern.edu/legalclinic/cfjc/.

7.      The Northwestern Pritzker School of Law, the Bluhm Legal Clinic, and the CFJC are part of Northwestern and act on its behalf.

COMPLAINT – 2

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

8.      CFJC faculty, staff, attorneys, and law students collaborate to promote justice for children, adolescents, and their families through direct legal representation, policy advocacy, and law reform.  The CFJC rests on several fundamental principles: that youth matters; that incarceration is rarely appropriate punishment for children; and that the justice system must consider the unique characteristics, needs, and capacities of children and adolescents when determining how they should be treated under the law.  The CFJC also seeks to reduce the disproportionate criminalization of youth of color and the over-incarceration of youth by expanding the use of community justice alternatives.

9.      The CFJC represents young people on a wide range of matters, from delinquency to immigration, to cases addressing harsh sentencing practices or the collateral consequences youth face after coming into contact with the law.

10.      The CFJC also actively collaborates with organizations across the country on key policy and law reform initiatives affecting children and adolescents.  CFJC attorneys forge deep connections—from the grassroots level up to major government entities—to develop fair, effective, and lasting strategies for systems reform.

11.      As a teaching institution, the CFJC trains law students in critical skills such as interviewing, counseling, investigation, legal writing, negotiation, and oral advocacy.

12.      And as a holistic children's law center, the CFJC serves as a field placement for masters-level social work students.

13.      The CFJC has a national footprint.  Among other activities, the CFJC publishes the *Know Your Rights Zine* and other juvenile-justice materials, all of which are distributed nationwide; participates in national juvenile-justice organizations, programs, and networks, such as the National Juvenile Defender Center, the Campaign for the Fair Sentencing of Youth, and the MacArthur Foundation Models for Change; and provides legal, expert, and related consulting services on matters across the country.

COMPLAINT – 3

14. The CFJC has been working in Washington State and with Washington State organizations for many years.

15. For example, the CFJC partnered with King County in publishing *Your Guide to the Juvenile Justice System in Washington State*, attached hereto as Exhibit 1. This guide is offered online by Team Child, a nonprofit organization serving vulnerable children across Washington State and providing legal services to children in crisis in King, Pierce, Spokane, and Yakima counties, at https://teamchild.org/wp-content/uploads/2017/07/Washington-State-Know-Your-Rights-Graphic-Guide-2013.pdf.

16. Bluhm Legal Clinic and CFJC attorneys have served as expert witnesses in several juvenile-justice- and public-defense-related matters in Washington State, including *In the Matter of Cummings* (2004), *Best v. Grant County* (2005), and *In the Matter of Massey* (2006).

17. The CFJC has collaborated with Washington State or its political subdivisions on juvenile justice work under the auspices of the MacArthur Foundation Models for Change Action Network, the NJDC assessment and summit, and the Youth Registry Strategy Convening.

18. Alumni of Northwestern, including students who studied and practiced at the CFJC, live and practice law in jurisdictions throughout the country and in Washington State, including in Seattle, in King County, and in this District.

19. The CFJC's various activities, described above, are referred to collectively as the "CFJC Services."

20. In connection with the CFJC Services—for over 25 years and since 1992—Northwestern has continuously and without interruption used the marks CHILDREN AND FAMILY JUSTICE CENTER and CFJC (together, the "CFJC Marks").

21. Northwestern has invested significant time, energy, and resources in promoting and offering the CFJC Services under the CFJC Marks.

COMPLAINT – 4

22.     The CFJC has earned significant media attention, including articles in the *New York Times* and *Los Angeles Times* and segments on CBS News and ABC News.  Copies of the *New York Times* and *Los Angeles Times* articles are attached hereto as Exhibits 2 and 3.

23.     The CFJC has won acclaim for its work, including the MacArthur Award for Creative and Effective Institutions in 2013.

24.     As a result of these investments and efforts, Northwestern has developed substantial and valuable goodwill in the CFJC Marks, and owns strong common law rights in the CFJC Marks in many jurisdictions across the United States, including in King County, Washington.

25.     The CFJC Marks are proprietary, highly valuable, and important assets of Northwestern and its ongoing mission.

26.     Northwestern has priority of use over Defendant with respect to the CFJC Marks.

27.     The CFJC Marks are distinctive and/or have developed secondary meaning and significance in the minds of the consuming public.

**Defendant's Infringing Activities**

28.     Despite years of sustained community opposition and a 2015 Seattle City Council resolution calling for zero youth detention, Defendant decided to spend over $200 million to build a new juvenile detention facility with 112 beds (the "New Facility").

29.     In late 2016, Northwestern learned that King County was contemplating naming the New Facility "the Children and Family Justice Center."  Northwestern sent a letter to Defendant on December 22, 2016, objecting to Defendant's possible use of the CHILDREN AND FAMILY JUSTICE CENTER on two primary grounds.  First, because detaining youth and building facilities for that purpose conflicts with the CFJC's core mission, and second, simply to avoid confusion between Northwestern and Defendant and its New Facility.  A copy of that letter, to which Defendant never responded, is attached hereto as Exhibit 4.

COMPLAINT – 5

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

30.     In May 2019, the King County Council introduced Ordinance 18961, which, among other things, proposed naming the New Facility after the late Judge and "revered community member" Patricia H. Clark.  The King County Council passed Ordinance 18961 on July 24, 2019, and County Executive Dow Constantine approved it on July 31, 2019.

31.     In or around February 5, 2020, Defendant announced that it was opening the New Facility and calling it the Judge Patricia H. Clark Children and Family Justice Center, or CFJC. In addition to juvenile detention services, Defendant offers, intends to offer, or intends to house other organizations that offer various juvenile and juvenile-justice-related services, including detention alternatives, family services, and other social services for youth and their families ("Defendant Services") under the CHILDREN AND FAMILY JUSTICE CENTER and CFJC marks.

32.     On its website, Defendant repeatedly refers to the New Facility as the "Children and Family Justice Center" and/or the "CFJC."  True and correct copies of Defendant's website are attached hereto as Exhibit 5.

33.     Northwestern has never authorized any of the above-recited activities or any other use of the CFJC Marks in any manner whatsoever.

34.     On February 14, 2020, Northwestern sent Defendant a second letter again asking that Defendant reconsider adopting the CFJC Marks in connection with the New Facility.  That letter is attached hereto as Exhibit 6.  Defendant responded on March 3, 2020, declining to discontinue its use of the CFJC Marks.

35.     Since then, Northwestern has engaged with Defendant in an attempt to resolve the dispute amicably and avoid litigation, recognizing the additional burdens on the courts and Defendant amidst the COVID-19 pandemic.  During these discussions, King County repeatedly stated that, if it was unwilling to consider a name change, it would inform Northwestern directly. To facilitate those discussions, King County agreed that it would not use the negotiation period

COMPLAINT – 6

1    against Northwestern if discussions failed.  On May 22, 2020, Defendant informed Northwestern

2    that it would not consider a name change.  A copy of that letter is attached hereto as Exhibit 7.

3        36.    On information and belief, Defendant has willfully and intentionally engaged in

4    the forgoing activities with the knowledge that the CFJC Marks were used and owned by

5    Northwestern and that using the CFJC Marks in conjunction with the New Facility was

6    unauthorized.

7        37.    Defendant's use of the CFJC Marks without permission is, and has been, a

8    deliberate attempt to trade on the valuable trademark rights, goodwill, and consumer trust

9    established by Northwestern in the CFJC Marks.

10        38.    Defendant's actions have caused or are likely to cause significant harm to

11    Northwestern's reputation and hard-earned goodwill and trust.

## IV.  CAUSES OF ACTION
### COUNT I:
### False Designation of Origin

39.    Northwestern incorporates by reference the allegations contained in the preceding
paragraphs as if separately repeated here.

40.    Defendant's conduct as described herein constitutes false designation of origin in
violation of 15 U.S.C. § 1125(a).

41.    Defendant's actions constitute the use in interstate commerce of a false
designation of origin, false or misleading description of fact, or false or misleading
representations of fact that are likely to cause confusion or mistake, or to deceive as to the
affiliation, connection, or association of Defendant's Services with Northwestern, or as to the
origin, sponsorship, or approval of the services provided by Defendant in violation of 15 U.S.C.
§ 1125(a).

COMPLAINT – 7

42.     Consumers seeing Defendant's use of such confusingly similar marks in the marketplace are likely to believe that Defendant and/or Defendant's Services are the same as Northwestern or sponsored by, associated with, or otherwise affiliated with Northwestern.

43.     Defendant's infringing activities are knowing, willful, and intentional violations of Northwestern's rights.

44.     Defendant's acts of false designation of origin, unless restrained, will cause great and irreparable harm to Northwestern and to the goodwill represented by the CFJC Marks, in an amount that cannot be ascertained at this time, leaving Northwestern with no adequate remedy at law.

45.     Northwestern is thus entitled to injunctive relief restraining Defendant from any further acts of false designation of origin, as well as recovery of Northwestern's costs and reasonable attorneys' fees under 15 U.S.C. §§ 1116, 1117, and 1125.

## COUNT II:
### Unfair and Deceptive Practices Act - RCW 19.86.020

46.     Northwestern incorporates by reference the allegations contained in the preceding paragraphs as if separately repeated here.

47.     Defendant's foregoing acts constitute unfair methods of competition, and unfair or deceptive acts or practices in the conduct of trade or commerce, in violation of RCW 19.86.020.

48.     Defendant's conduct affected and affects, and was contrary to, the public interest; tended and tends to mislead a substantial portion of the public; and has injured Northwestern in its business and property in the State of Washington.

49.     As a result of Defendant's conduct, Northwestern has been damaged and is entitled to recover the costs of litigation and attorneys' fees, and to enjoin Defendant's conduct.

COMPLAINT – 8

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

**COUNT III:**
**Common Law Trademark Infringement and Unfair Competition**

50.     Northwestern incorporates by reference the allegations contained in the preceding paragraphs as if separately repeated here.

51.     Defendant's acts constitute common law trademark infringement and unfair competition, and have created and, unless restrained by this Court, will continue to create a likelihood of confusion to the irreparable injury of Northwestern.

52.     Northwestern has no adequate remedy at law for this injury.

53.     On information and belief, Defendant acted with full knowledge of Northwestern's use of, and common law rights to, the CFJC Marks and without regard to the likelihood of confusing the public created by Defendant's activities.

54.     Defendant's actions demonstrate an intentional, willful, and malicious intent to trade on the goodwill associated with Northwestern's CFJC Marks to the great and irreparable injury of Northwestern.

55.     As a result of Defendant's acts, Northwestern has been damaged in an amount not yet determined.  At a minimum, however, Northwestern is entitled to injunctive relief.

## V.     PRAYER FOR RELIEF

**WHEREFORE,** Northwestern seeks the following relief:

A.     Defendant and all of its agents, officers, employees, representatives, successors, assigns, attorneys, and all other persons acting for, with, by, through, or under authority from Defendant, or in concert or participation with Defendant, and each of them, be enjoined preliminarily and permanently from:

(a)     using the CFJC Marks or any trademark, trade dress, service mark, name, logo, design, or source designation of any kind on or in connection with Defendant's Services that is a copy, reproduction, colorable imitation, or simulation of, or confusingly similar to the CFJC Mark; and

COMPLAINT – 9

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

1           (b)     using any trademark, trade dress, service mark, name, logo, design, or

2 source designation of any kind on, or in connection with, Defendant's Services that is likely to

3 cause confusion, mistake, deception, or public misunderstanding that such services are produced

4 or provided by Northwestern, are sponsored or authorized by Northwestern, or are in any way

5 connected or related to Northwestern.

6        B.     Defendant be required to pay Northwestern the costs of this action and

7 Northwestern's reasonable attorneys' fees; and

8        C.     For such other relief as the Court may deem just and proper.

9

10 DATED:  July 3, 2020

By: _/s/ William C. Rava_____
By: _/s/ Alison R. Caditz_____
William C. Rava, WSBA #29948
Alison R. Caditz, WSBA #51530
**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Telephone:  206.359.8000
Facsimile:  206.359.9000
Email:  WRava@perkinscoie.com
       ACaditz@perkinscoie.com

Attorneys for Plaintiff
NORTHWESTERN UNIVERSITY

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

COMPLAINT – 10

**EXHIBIT 1**



This publication was adapted by TeamChild® from an original publication prepared for the Illinois Mental Health and Juvenile Justice Action Network by Jean Davidson Meister, project manager, and Kim Miller, both of the Illinois Children's Mental Health Partnership; Elgin-Bokari T. Smith, illustrator, and Julie Biehl, Children and Family Justice Center, Northwestern University School of Law.  Graphic design by Ashley Kittrell.  The original and this adapted publication were supported by the John D. and Catherine T. MacArthur Foundation Models for Change Initiative.

Special thanks to Sharon Paradis (Juvenile Court Administrator for Benton and Franklin Counties), Rosa Peralta, George Yeannakis and Anne Lee of TeamChild as well as Daniel Ediger and Susan Encherman from the Northwest Justice Project for the support of this adapted publication.

Anyone may use the content of this publication as is for educational purposes as often and for as many people as wished. All we ask is that you identify the material as being the property of TeamChild based on the original work of the Children and Family Justice Center, Northwestern University School of Law, and the Illinois Children's Mental Health Partnership.

This publication may be downloaded at www.ccyj.org or www.teamchild.org

## TeamChild®

TeamChild is a nonprofit civil legal services organization in Washington State with offices in King, Pierce, Snohomish, Spokane and Yakima Counties.  Valuing the potential in all young people, TeamChild is a voice for those facing tremendous obstacles due to poverty, racism, disability, homelessness, neglect, abuse and other difficult circumstances. TeamChild's work focuses on helping youth involved in the juvenile justice system assert their right to education, mental and medical health treatment, and safe living situations.   The program has been recognized nationally for its innovation and effective engagement of young people who might otherwise fall through the cracks.  TeamChild was a recipient of a MacArthur Foundation Models for Change grant to improve the access to and quality of juvenile defense in Washington State. For more information about TeamChild and its projects, see www.teamchild.org.

## Models for Change

John D. and Catherine T. MacArthur Foundation believes that every young person should have the opportunity to grow up with a good education, get a job and participate in our communities. Creating more fair and effective juvenile justice systems that support learning and growth and promote accountability can ensure that all of our young people grow up to be healthy, productive members of society.

Models for Change: Systems Reform in Juvenile Justice, a MacArthur Foundation initiative, began by working comprehensively on juvenile justice reform in four states, and then by concentrating on issues of mental health, juvenile indigent defense, and racial and ethnic disparities in 16 states. Through collaboration with the Substance Abuse and Mental Health Services Administration (SAMHSA) and the Office of Juvenile Justice and Delinquency Prevention (OJJDP), Models for Change expanded its reach and is now working to replicate and disseminate successful models of juvenile justice reform in 31 states.



# STOP. STAY CALM. THINK.
# REMEMBER YOUR RIGHTS BEFORE YOU SAY OR DO ANYTHING.



You DO NOT have to talk to police. If you are stopped by police, stay calm and ask, "Am I free to go?" If the answer is yes, leave right away.

If the answer is no, tell police you want a lawyer. You have a right to a lawyer, and police are supposed to stop questioning you as soon as you ask for one.

YOU DO NOT HAVE TO TALK TO POLICE, but you do have to follow their instructions. Police might search or restrain you. Don't talk back and keep your hands where police can see them. Never touch a police officer.



THE POLICE MAY ASK to search your bag or a backpack you are carrying. DO NOT let the police search your things. Politely say, "I do not want you to look in my bag. I do not give you permission."

1



IF YOU ARE ARRESTED or held by police, tell the police, "I want to talk to a lawyer." You should give your name and address. You don't have to say anything else. Even simple information, like where you were on a certain date, could hurt you later.

POLICE ARE TRAINED TO GET YOU TO TALK. Police may say that you can go home sooner if you talk, or that someone saw you commit a crime, to get you to talk.

It does not mean you are guilty if you DO NOT TALK TO THE POLICE and ask for a lawyer. You have a right to a free lawyer if you are accused of a crime. A lawyer can protect your rights and help tell your side of the story.

Also, you do not have to sign papers until you talk to a lawyer. You may be signing away important rights.

You may be tempted to talk to others about your situation. You might feel like texting a friend or posting about it on Facebook or Twitter.
DON'T DO IT!
Sharing information online could hurt you later.



2



TELL POLICE HOW TO REACH YOUR PARENT or an adult family member. You do not have to say anything else.



If the police take you to detention, they will probably take your photo and your fingerprints. People at the detention center may ask you about your health, education, and family. Try to answer these questions honestly....But don't answer any questions about why you were arrested. Politely say that you want to talk to a lawyer before talking about your arrest or the charges against you.

3

If you are arrested and put in detention, you will have a hearing on the next day the judge is in court. At this hearing the judge will decide if you can go home or if you have to stay in detention.



*YOUR HONOR, I WANT A LAWYER.*

Your lawyer should meet with you before your hearing. If you don't have a lawyer at the hearing, ask the judge for one. If you don't understand something, ask your lawyer to explain BEFORE you leave court. If you still don't understand, ASK again, and keep asking until you get the information you need.

## IF YOU ARE CHARGED WITH A CRIME, YOU COULD BE SENT HOME OR HELD IN CUSTODY UNTIL YOUR ARRAIGNMENT HEARING.



ANY TIME YOU GO TO COURT:
- Be on time.
- Dress neatly. Wear a shirt with a collar if you have one.
- Cover tattoos if you can.
- Take your hat off in the courtroom.
- Be sure to turn off your cell phone.

ALWAYS BE RESPECTFUL when you speak to the judge and others in court. Call the judge "Your Honor."

4

If you are charged with a crime, YOU HAVE A RIGHT TO A TRIAL. This is YOUR choice. If you have a trial, the judge will decide whether or not you are guilty of the crime. The judge makes this decision after listening to witnesses. You might also tell your side of the story to the judge during the trial.



You may also have the choice to plead guilty and not have a trial. Take your time to decide what to do in your case. Ask your attorney to explain things to you if you do not understand your choices. Pleading guilty is a decision that could affect the rest of your life.



WRITE DOWN EVERYTHING or ask a family member to help you keep track of your next court date, the names of police officers, your lawyer, probation officer and the judge. Get phone numbers too. Keep all notes and all letters about court dates or probation rules in a safe place, where you can find them.

This information is important!

Do not miss a court date because this could lead to another arrest or jail.

5

## THE JUDGE'S RULING



IF THE JUDGE DECIDES THAT YOU ARE NOT GUILTY, THE CASE IS OVER AND YOU CAN GO HOME.

IF THE JUDGE DECIDES THAT YOU ARE GUILTY, YOU COULD BE SENTENCED TO:
- Community Supervision (Probation) and allowed to go home
- Receive counseling and/or substance abuse treatment
- Work without pay on jobs that benefit the community (community service)
- Serve time in a juvenile detention center
- Serve time in an institution run by Juvenile Rehabilitation Administration (JRA)

AFTER THE JUDGE RULES IN YOUR CASE:
- Follow all probation rules!
- If you don't understand the rules, ASK!
- If you break the rules, you could go back to detention or JRA.

YOU HAVE A RIGHT TO APPEAL THE JUDGE'S DECISION
This means that another judge will decide if it is a good decision or a bad decision. You have to decide fast, because you only have 30 days after sentencing to ask for an appeal. You can get a lawyer to file your appeal for free.

**IF YOU ARE SENT TO A JUVENILE DETENTION CENTER OR THE JUVENILE REHABILITATION ADMINISTRATION (JRA):**

Follow the rules! If you don't you could be charged with a new crime.



COOPERATE IN THERAPY AND GO TO SCHOOL

Ask for help if you are feeling sad, angry or upset.

Take advantage of school and job training. You have a right to an education even if you are incarcerated.



YOUR FAMILY IS IMPORTANT!
Stay in touch with calls and visits. Family therapy can help too.

# WHEN YOU ARE RELEASED



**ASK FOR HELP.**
You will need support. Lean on your family, friends, teachers, your church, mentors or community leaders. Look for counseling near your home. Get involved in school, a job, or something else you enjoy.

**START FRESH**
You may be eligible to have your records sealed. You are eligible after waiting two or five years from the date of your disposition, the date you completed your diversion agreement or the date that you were released from detention or JRA. Getting your records sealed may help you get a job, go to college, rent an apartment or join the military. You may need an attorney to help you with the forms or you can try to follow the steps listed in the Sealing Juvenile Court Records in Washington found at: TeamChild (www.teamchild.org) or Washington Law Help (www.washingtonlawhelp.org/)





**WHEN YOU GET OUT, STAY OUT!**
Get help if you are sad or angry or having trouble coping with life. It's a big change to return to regular life, and it's normal to struggle for awhile. It helps to talk to somebody who understands. A doctor or a social worker can help you with emotional issues or trauma.

# WHO'S WHO IN THE COURTROOM

THE JUDGE
The judge is in charge of the courtroom. The judge listens to information from your probation officer, lawyers, witnesses, and sometimes even you.  Based on this evidence, the judge decides if you are guilty or not guilty and sets the sentence in your case.

THE PROSECUTOR
The prosecutor's job is to prove that charges against you are true and that you broke the law.  To do this, he or she presents evidence and brings in witnesses (like police officers) to testify against you.  The prosecutor will use what you said to the police officers to prove that you broke the law.

DEFENSE LAWYER
The defense lawyer works for you. The defense lawyer's job is to tell you about the law and your choices, and to present evidence and witnesses to help you.  The defense lawyer will investigate the case and tells you the choices you have, but you make the final decision to plea or go to trial.   Ask your lawyer to explain things to you and make sure your lawyer knows what you want. Your lawyer works for you and should follow your directions.  If you cannot pay for a private lawyer, the court will appoint a lawyer (called a public defender) for free.

JUVENILE PROBATION COUNSELOR
The probation counselor works for the county and is there to learn about your needs, set up services for you, give information to the judge about you and supervise you while you are on community supervision (also known as probation).

CLERK
The clerk is seated next to the judge. The clerk is responsible for all legal records and information about every case that the judge works on.

10

## FACTS YOU SHOULD KNOW

1. In Washington, if you are under 18, you are considered a juvenile and will go to juvenile court for most charges. If you are charged with a very serious crime such as murder, rape and some crimes committed with a gun, you could be charged as if you are an adult and go to adult court, which includes facing adult jail or prison time. If you are under 8 years of age, you cannot be charged with a crime.

2. A PROBABLE CAUSE or DETENTION HEARING is the first court hearing you will have to attend. At this hearing, the judge decides if there is enough information to believe you may have committed a crime. This does not mean that the judge thinks you are guilty. It only means that the information shows that there is a chance that you broke the law. If the judge decides that there is a reason to believe that you probably caused or committed a crime ("probable cause"), then she or he will decide if you will have to stay in detention or if you can go home.

3. CONDITIONS OF RELEASE. If you are allowed to go home the judge will give you rules that you have to follow called the conditions of [your] release from detention. You must follow all these rules if you want to stay out of detention.

4. DISPOSITION: In juvenile court, sentencing is called disposition. At the disposition, a judge tells you the penalty for your crime. The judge can place you in detention, put you on probation, order counseling and require that you pay for the damage caused by your crime (the money you owe for this is called "restitution").

5. PROBATION or COMMUNITY SUPERVISION is a period of months when you must follow rules set by the judge at your disposition. During this time, a juvenile probation counselor will supervise you and make sure that you follow the rules and complete any work the judge gave you. If you break the probation rules you can be sent back to juvenile detention.

11

## FACTS YOU SHOULD KNOW

6.   PAROLE can be given for a period of time after you are released from a juvenile institution (JRA).  You must follow ALL the parole rules. Parole usually lasts up to one year.  If you are on parole, you are supervised by a parole officer who works for the state. If you break parole rules, you can be sent back to JRA.

7.   INTERPRETERS.  If you need help understanding what your attorney or judge is saying you can ask for an interpreter.  The interpreter will tell you exactly what is being said in court.

## IMPORTANT INFORMATION

MY LAWYER'S NAME _____

PHONE NUMBER _____

MY PROBATION OFFICER'S NAME _____

PHONE NUMBER _____

MY JUDGE'S NAME _____

COURTROOM NUMBER_____

COURT DATES AND TIMES _____

_____

_____

_____

OTHER IMPORTANT PEOPLE_____

_____

_____

_____

12



## JUVENILE JUSTICE DO'S & DON'TS

STOP. STAY CALM. THINK BEFORE YOU SAY OR DO ANYTHING.

DO NOT TALK TO POLICE WITHOUT YOUR LAWYER.

NEVER TOUCH A POLICE OFFICER.

BE RESPECTFUL IN COURT.

GET HELP IF YOU ARE ANGRY, UPSET, SAD OR
HAVING TROUBLE COPING WITH LIFE.

---

THE JUVENILE JUSTICE SYSTEM CAN BE SCARY
AND CONFUSING, EVEN IF YOU HAVEN'T DONE
ANYTHING WRONG. YOU MIGHT FEEL POWER-
LESS AND SCARED AROUND POLICE, LAWYERS
AND JUDGES. THAT'S WHY IT'S IMPORTANT TO
KNOW THAT YOU HAVE LEGAL RIGHTS THAT
NO ONE CAN TAKE AWAY!

---



An initiative supported by the John D.
and Catherine T. MacArthur Foundation
www.macfound.org

# EXHIBIT 2

**The New York Times** | https://nyti.ms/298bNHr

# High Court Call: Father's Rights or Child's Interest

**By <u>Susan Chira</u>**

July 17, 1994



See the article in its original context from
July 17, 1994, Section 1, Page 12    Buy Reprints

**VIEW ON TIMESMACHINE**

TimesMachine is an exclusive benefit for home delivery and digital subscribers.

### About the Archive

*This is a digitized version of an article from The Times's print archive, before the start of online publication in 1996. To preserve these articles as they originally appeared, The Times does not alter, edit or update them.*

*Occasionally the digitization process introduces transcription errors or other problems; we are continuing to work to improve these archived versions.*

Legal experts say the Illinois Supreme Court decision last week ordering that an adopted child be given to his biological parents highlights the continuing uncertainties about how to define fathers' rights and children's best interests.

These uncertainties could be resolved by the United States Supreme Court, where the adoptive parents in the case say they plan to turn next.

The biological father of the child, a 3 1/2-year-old known as Baby Richard, won custody after convincing the court that the infant should not have been adopted. The father said that Richard's mother had falsely told him the baby had died, so he was unable to assert his paternal rights.

Adoption advocates say the case has left parents worrying whether their adoptive child's father might suddenly appear and claim the child they had reared. "This is a dangerous precedent," said Mary Beth Style, the vice president of the National Council for Adoption. "I've had calls coming in from frantic adoptive parents with a 4-, 5- 6-year-old kid saying, 'Can they take our kid?' " Emphasis on Following Rules

But several legal experts said that the circumstances of the Illinois case were so rare that most parents need not fear losing their children. If parents make sure a biological father knows about and consents to an adoption, they said, they will be safe.

"The people who follow the rules of adoption have nothing to worry from this case," said Bruce Boyer, a lawyer with the Children and Family Justice Center of Northwestern University Law School, who helped argue the case of the biological father, Otakar Kirchner, who later married Richard's mother, Daniella.

The passions the case has unleashed recall the furor over the decision last year to remove a 2-year-old girl, then known as Jessica DeBoer, from the parents who had reared her and wanted to adopt her. The court awarded custody to her biological father, whose girlfriend at first had said another man had fathered Jessica. That decision, several adoption experts said, has emboldened more unwed fathers to try to revoke children's adoptions, although several state courts have ruled against them.

Adoption advocates argue that the Illinois case is far more damaging to adoption than the DeBoer decision because Richard's adoption was approved by a lower court, while the DeBoers never legally adopted Jessica. And unlike the DeBoers,

who lost every court decision to the biological parents, the Illinois adoptive parents had won two lower court rulings. The Illinois high court ruled that Baby Richard could continue living with his adoptive parents temporarily. Fresh Ground for High Court

Mr. Boyer said that Richard's biological father began trying to win custody when the baby was less than 3 months old, before the adoption was complete, and that he continued to appeal the adoption.

Jay Katz, professor of law, medicine and psychiatry at the Yale Law School, said the Supreme Court had an opportunity to rule on an issue that it has never decided. "Should biology come before whatever psychological needs the child might have to a continuation of the relationship the child has established with his adoptive parents?" Professor Katz said. "I would hope that biology alone should not be given precedent."

Courts have usually ruled in favor of biological parents' rights, without considering that children may have already formed intense psychological bonds to the adoptive parent, said Albert J. Solnit, who framed the idea of an emotional bond in an 1979 book, "Beyond the Best Interests of the Child." 'Overly Simplistic'

But Mr. Boyer said that children's best interests might also lie in establishing a relationship with biological parents who wanted them. "To assume that the best interests of the child lie invariably in remaining with the psychological parent is overly simplistic," he said. "The child has to consider all the issues arising from his having parents out there who fought to get him back."

Scholars on both sides of the issue say recent cases point up problems with current adoption laws. Although the Supreme Court has ruled since the mid-1970's that courts must take into account the rights of unwed fathers, states have established wildly varying standards for doing so, said Joan Heifetz Hollinger, a law professor who is drafting a proposed adoption law as a standard for states.

In most states, as in Illinois, Professor Hollinger said, the law is vague about just what fathers have to do to establish their paternal rights. Her proposal would require fathers to file a paternity action once they know of a child's existence and to try to pay child support and visit the child. It would also limit to six months after an adoption the time that fathers could try to claim a child. Fathers' Registries Proposed

Elizabeth Bartholet, who argues in her book, "Family Bonds," (Houghton Mifflin), that too many barriers to adoption now exist, has proposed fathers' registries, where a man would acknowledge an infant's paternity and receive notice of any adoption proceedings. If a father did not act within a certain period, he would have no more claim to the child.

Others, like Marian Faupel, who represented the biological parents in the Baby Jessica case, argue that the adoption process should take longer, to give biological parents more time to make sure they want to give up their children.

In the end, one problem no one disputes is how much damage can be inflicted on children when court cases drag on.

"The courts should be roundly condemned for a system that allows such delays," said Howard Davidson, director of the American Bar Association's Center on Children and the Law. But Mr. Davidson said these cases had so far failed to prompt overhauls of judicial systems to speed children's cases -- a change that would help not only the comparatively rare adoption battles but the far more common disputes over custody and foster care.

**EXHIBIT 3**



ADVERTISEMENT



# Young Rape Victim a Symbol of Outrage : Comatose girl, 9, has become a focal point of Chicago black community's concerns. But some doubt wisdom of using tragedy to highlight public issues.

By STEPHEN BRAUN

MARCH 19, 1997

12 AM

TIMES STAFF WRITER

She is 9 years old and blank to the outside world she once played in. She lies curled in fetal position in a rehabilitation clinic bed, under 24-hour watch by police guards. In the few waking moments that interrupt her fitful coma, her eyes open and eerie noises gush from her throat.

She is Girl X, the victim of a brutal assault and rape in a seventh-floor stairwell at Chicago's Cabrini-Green housing project--and an unwitting symbol of outrage in this city's black community.

In the two months that have passed since neighbors found Girl X unconscious--poisoned with gasoline and her belly scrawled with ink-stained gang signs--Chicago's black leaders have raised more than $200,000 to help pay her medical bills and have cited her case as an example of a laundry list of social and cultural ills: the public's inattention to sexual assault, the failure of police to devote adequate resources to inner city neighborhoods, the paltry coverage of ghetto crime by a mainstream media obsessed with the more middle-class and whiter trappings of the JonBenet Ramsey murder case.

"Girl X's case teaches us that we need to look much harder at what happens to young girls and teenagers, even in the toughest neighborhoods," said Toylee Green, who directs a sexual assault program for a South Side Chicago YWCA. "The reality is that girls are being assaulted in housing project buildings in this city and they're not getting the attention that the Girl X case has got."

"What's unique in this case," said former antiwar militant Bernardine Dohrn, who now heads the Northwestern University Law School's Children and Family Justice Center, "is that there's been such a clear and sustained response from the bottom up."

Yet some activists who played a critical role in raising funds for Girl X and awareness of her plight are cautioning about how far the private dimensions of a tragic case can be stretched to highlight public issues.

"This is one situation where we decided that we were going to help," said Marv Dyson, a radio station president who spearheaded the $200,000 fund-raising effort on behalf of Girl X. "But I think you get on shaky ground if you try to use this poor little girl's tragedy to push some agenda that doesn't fit."

In the weeks since WGCI AM (a soul oldies station) and FM (a black contemporary format) began appealing for money to help Girl X and her family, Dyson has been deluged with calls from relatives of other young assault victims asking for similar aid. Dyson has turned down the requests, not because he is any less sympathetic or fails to see the symbolic ties between the cases, but simply because Girl X's case is different--both in her savage treatment and in the primal state in which she was left.

"I appreciate what happens to all these victims," Dyson said. "But this was unique. When you see her in that hospital bed, you get so sad and so [angry]."

Dyson himself has a 9-year-old daughter, yet like so many Chicogans, the initial horrific report of Girl X's plight on Jan. 9 passed him by. But columnists with the Chicago Defender, the city's black newspaper, and the Chicago Sun-Times kept up public pressure--even as police investigators were unable to find any culprits (detectives have yet to make any arrests in the case).

When a morning drive-time disc jockey and a station personnel director showed him columns about the case on Jan. 30, Dyson was moved. The next day he told his staff the station had to do something. "We decided on a fund-raiser."

Parking a mobile studio outside the hospital where Girl X lay, station DJs held a 16-hour on-air marathon. All day long, listeners showed up at the hospital bearing checks and cash. Even after it ended, the checks kept coming. Los Angeles Lakers star Shaquille O'Neal sent $2,000. Geraldo Rivera gave $1,000 and had Dyson on his show. Nation of Islam Minister Louis Farrakhan provided security to take Girl X's mother to her clinic every day. Even at the clinic, black staffers drop by the child's room, checking on her progress as if the child "was their own," Dyson said.

Yet despite the black community's instant embrace of Girl X, Dyson doubts that her case is any sort of turning point. "When this case dies away, it will be business as usual," Dyson said. "I don't see the mayor [Richard M. Daley] talking about it. I don't see it stopping rapes. I don't see police treating the less sensational cases any differently."

The only evident spillover, other activists say, is fear. At the Cabrini homes, young girls "aren't being sent out by their moms to the store at night," said Cora Moore, a Cabrini tenant leader. "You don't see the girls running around the buildings like they used to. Their mothers keeping them home. Now they know what could happen."

Even that newfound caution, Moore worries, may not last. "You know what happens when people forget. Give 'em a few months. Those youngsters will be out by themselves again in no time."

Around the Web                                                                                        Ads by Revcontent

# EXHIBIT 4

# Northwestern

**PRITZKER** SCHOOL OF LAW

## Bluhm Legal Clinic

Children and Family Justice Center

December 22, 2016

King County Executive Dow Constantine
401 5th Ave. Suite 800
Seattle, WA  98104

Mayor Edward B. Murray
600 4th Avenue
Seattle, WA  98104

Dear Sirs,

Here at the Children and Family Justice Center in Chicago, a 25-year-old clinical program at Northwestern Pritzker School of Law, faculty and students represent youth and their families in juvenile, criminal, civil, and immigration proceedings.

From the time of "reform schools" on, juvenile justice has adopted euphemisms that hide what is being done to youth from public view and debate.

While these terms may be intended to avoid demeaning young people, youth who have been "placed" in a "youth center" understand very well that they are being forcibly incarcerated inside a juvenile jail or prison cell.

We strenuously object to the use of our good name for a detention center – not only because youth do better in community settings, but also because a name like ours obstructs public debate over that fact.

Sincerely,

*Julie Biehl*

Director

Northwestern Pritzker School of Law
375 East Chicago Avenue
Chicago, Illinois 60611-3069
Phone: 312.503.8576
cfjc@law.northwestern.edu
www.law.northwestern.edu/legalclinic/cfjc/

# EXHIBIT 5

 King County

# Judge Patricia H. Clark
## Children and Family Justice Center



**The new center will include:**
- Childcare for families on court business
- More space for youth and family programs
- A resource center connecting youth and families with services in their communities
- A flexible & therapeutic juvenile detention with 100 fewer beds
- Eco-friendly design with LEED Gold goal
- Bike & pedestrian paths
- *More info and project updates*



## Design & Construction

Child Welfare 

Juvenile Justice 

# Replacing the Youth Services Center



**A crowded court lobby has no space for confidential conversations**

"The water is brown and unfit to drink. The rusty pipes leak. The basement floods and entire wings are shut down due to mold and unsafe conditions. The heating and air conditioning systems barely work.

The waiting room is a bullpen. Families and children summoned to the courthouse are herded into a single large room, where they do not have enough places to sit and there are no private rooms to discuss the most intimate family issues with attorneys."

Read more of Executive Dow Constantine and Prosecuting Attorney Dan Satterberg's

op-ed about the current building's conditions.

# Outdated facilities to be replaced

The current Youth Services Center's aging facilities, some of which date back to 1952, require increasingly costly maintenance. The facility has almost twice the number of detention beds needed today, while lacking any space for youth and family programs designed to prevent future court-involvement. After estimating the costs of a full renovation and a price tag of over $40 million just to replace the existing facility's core operating systems, the King County Executive, Superior Court and County Council decided that it was time to replace the center altogether. In 2012, King County voters agreed when they passed a levy for its replacement.

# Supporting youth and families

The Children and Family Justice Center will replace the outdated Youth Services Center with a flexible and therapeutic facility that provides modern youth and family court services as well as a trauma-informed juvenile detention center. The new facility will provide a respectful and supportive environment to link even more youth and families – court-involved or not – with services and non-profit organizations in their own communities. Construction at 12th Avenue and Alder Street in Seattle's Central District will begin in 2017. The new center will open in late 2019, and the parking garage is scheduled to open in 2021.

King County is dedicated to best practices in child welfare cases, juvenile court proceedings and juvenile detention. As a result, King County has one of the lowest youth incarceration rates of any urban region in the United States. The County's youth detention population has declined almost 70% over the last decade with the help of growing alternatives to court involvement and detention.

About the project | FAQs | Contact us

Website header art: *Spirit of Our Youth* by Marvin Oliver



# Facilities Management Division

500 Fourth Ave., Suite 800
Seattle, WA 98104

 

✉ <u>Email</u>

📞 206-477-9400

☎ TTY Relay 711

📠 Fax 206-205-5070

Last Updated August 27, 2019

# EXHIBIT 6



| | William C. Rava |
| --- | --- |
| | WRava@perkinscoie.com |
| | D.   +1.206.359.6338 |
| | F.   +1.206.359.7338 |

1201 Third Avenue
Suite 4900
Seattle, WA 98101-3099

☎ +1.206.359.8000
🖷 +1.206.359.9000
PerkinsCoie.com

February 14, 2020

***VIA HAND DELIVERY & EMAIL*** (Prosecuting.Attorney@kingcounty.gov)

Jimmy Hung, Juvenile Division Chief
Stephanie Trollen, Juvenile Operations Manager
Kevin Wright, Civil Division Chief
Pete Ramels, Section Head, Transportation and Real Property
Prosecuting Attorney's Office
King County Courthouse, W400
516 Third Avenue
Seattle, WA  98104

**Re:     The Children and Family Justice Center**

Dear King County Prosecuting Attorneys:

Perkins Coie represents Northwestern Pritzker School of Law, the Bluhm Legal Clinic, and the Children and Family Justice Center (the "CFJC"), and I write today, as the CFJC did in December 2016, to express concerns regarding King County's use of the name and marks CHILDREN AND FAMILY JUSTICE CENTER and CFJC in connection with its new juvenile detention facility.

**The CFJC, Its Services, and Its Trademark Rights**

Founded in 1992, the CFJC is a comprehensive children's law office and part of the Bluhm Legal Clinic at Northwestern Pritzker School of Law.  CFJC faculty, staff, attorneys, and law students work together to promote justice for children, adolescents, and their families through direct legal representation, policy advocacy, and law reform.  In all its activities, the CFJC strives to advance the notion that youth matters, and that the justice system must consider the unique characteristics, needs, and capacities of children and adolescents when determining how they should be treated under the law.  The CFJC also seeks to reduce the disproportionate criminalization of youth of color and to reduce the over-incarceration of youth by expanding the use of community justice alternatives.

Specifically, the CFJC represents young people on a wide range of matters, from delinquency to immigration and asylum to cases addressing harsh sentencing practices or the collateral consequences youth face after coming into contact with the law.  The CFJC also actively collaborates, in Chicago and nationally, on key policy and law reform initiatives affecting children and adolescents.  CFJC attorneys forge deep connections—from the grassroots level up

King County
February 14, 2020
Page 2

to major government entities—to develop fair, effective, and lasting strategies for systems reform.  As a teaching institution, the CFJC trains law students in critical lawyering skills such as interviewing, counseling, investigation, legal writing, negotiation, and oral advocacy.  And as a holistic children's law center, the CFJC additionally serves as a field placement for training masters-level social work students.

Although physically located in Chicago, the CFJC has a national footprint.  Among other activities, the CFJC publishes the Know Your Rights Zine and other juvenile-justice-related materials, all of which are distributed nationwide; participates in national juvenile-justice-related organizations, programs, and networks, such as the National Juvenile Defender Center, the Campaign for the Fair Sentencing of Youth, and the MacArthur Foundation Models for Change; and provides legal, expert, and related consulting services on cases and litigations across the country.  Northwestern Pritzker School of Law alumni, including students who studied and practiced at the CFJC, practice law in jurisdictions throughout the country.

The CFJC has also been working in Washington state and with Washington state organizations for many years.  The CFJC has partnered with King County on a version of its Know Your Rights Zine, available from Team Child at https://teamchild.org/wp-content/uploads/2017/07/Washington-State-Know-Your-Rights-Graphic-Guide-2013.pdf; clinic and CFJC attorneys have served as expert witnesses in several juvenile-justice- and public defense-related matters, including *In the Matter of Cummings* (2004), *In the Matter of Massey* (2006), and *Best v. Grant County* (2005); and the CFJC has worked with Washington state or its political subdivisions on juvenile justice programs such as the MacArthur Foundation Models for Change, NJDC assessment, and the Youth Registry Strategy Convening.  CFJC alumni, including the undersigned, also live and work in King County and elsewhere in Washington state.  We refer herein to the CFJC's activities collectively as the "CFJC Services."  More information about the CFJC, its programs, and the CFJC Services can be found at http://www.law.northwestern.edu/legalclinic/cfjc/.

In connection with the CFJC Services, since 1992, the CFJC has continuously and without interruption used the marks CHILDREN AND FAMILY JUSTICE CENTER and CFJC (together, the "CFJC Marks").  The CFJC has invested significant time, energy, and resources in promoting and offering the CFJC Services under the CFJC Marks; the CFJC has earned significant third-party media attention, including in the *New York Times* and *Los Angeles Times* and on CBS News and ABC News; and CFJC has won acclaim for its work, including receiving the MacArthur Award for Creative and Effective Institutions in 2013.  As a result of these investments and efforts, the CFJC has developed substantial and valuable goodwill in the CFJC Marks and owns strong common law rights in the CFJC Marks in many jurisdictions across the United States, including in King County, Washington.  The CFJC has also applied to register the CFJC Marks at the United States Patent and Trademark Office; those applications are pending.

King County
February 14, 2020
Page 3

The CFJC considers the CFJC Marks to be proprietary, highly valuable, and important assets of the CFJC and its ongoing mission.

**King County and Its Infringement of the CFJC Marks**

In late 2016, the CFJC learned that King County was contemplating naming its new detention center "the Children and Family Justice Center." In part because detaining youth and building facilities for that purpose conflicts with the CFJC's core mission and in part simply to avoid confusion between the two organizations, on December 22, 2016, the CFJC sent a letter to King County (and Seattle) voicing its objection to King County's possible use of the CHILDREN AND FAMILY JUSTICE CENTER mark. A copy of that letter is enclosed. King County never responded (nor did Seattle).

It now appears that King County intends to call its new juvenile detention facility the Judge Patricia H. Clark Children and Family Justice Center and that, from that facility, in addition to juvenile detention services, intends to offer or house other organizations that offer various juvenile and juvenile-justice-related services, including detention alternatives, family services, and other social services for youth and their families (the "King County Services"). On its website, King County repeatedly refers to the facility as the "Children and Family Justice Center" and/or the "CFJC."

The CFJC is concerned that King County's use of marks that are identical to the CFJC Marks in connection with the similar and/or overlapping King County Services will cause confusion or mistake as to a non-existent association or affiliation with the CFJC. This use would constitute trademark infringement and unfair competition under the Lanham Act, 15 U.S.C. § 1125(a), and under applicable Washington state unfair competition laws, entitling the CFJC to an award of damages, attorneys' fees and costs, and injunctive relief against King County.

Although it is fully prepared to defend its rights, the CFJC would of course prefer to resolve this matter without the need for further legal action. To that end, the CFJC respectfully requests that King County agree in writing by **no later than February 28, 2020** that it will take the following steps:

1. By March 16, 2020, remove all references on the internet pages that King County operates or controls to the terms CHILDREN AND FAMILY JUSTICE CENTER and/or CFJC;

2. By April 17, 2020, provide the CFJC with a written proposal to remove or cover all physical signs over which King County has control bearing the terms CHILDREN AND FAMILY JUSTICE CENTER and CFJC by no later than December 31, 2020;

King County
February 14, 2020
Page 4

3.  Agree that, after March 16, 2020, King County will not order, produce, or cause to be ordered or produced any printed materials with the terms CHILDREN AND FAMILY JUSTICE CENTER and/or CFJC; and

4.  Agree that by no later than December 31, 2020, King County will have ceased and will forever desist from any and all use of the terms CHILDREN AND FAMILY JUSTICE CENTER and/or CFJC.

To be clear, although the CFJC does not support juvenile detention, it does not object to King County's provision of the King County Services from its newly-constructed facility. But King County cannot use a confusingly-similar name for the facility from which to provide the King County Services.

Thank you in advance for your prompt attention to this important matter. If you have any questions concerning these issues, please contact me directly.

The CFJC reserves all of its rights and remedies.

Sincerely,

William C. Rava

WCR:jrs

cc:    Thad Chaloemtiarana, Pattishall McAuliffe, Chicago
       Jacquelyn R. Prom, Pattishall McAuliffe, Chicago

# EXHIBIT 7



CHRISTENSEN | O'CONNOR
JOHNSON | KINDNESS

May 22, 2020

**VIA E-MAIL ONLY**
E-Mail Address: WRava@perkinscoie.com

William C. Rava
Perkins Coie LLP
1201 3rd Avenue
Suite 4900
Seattle, WA 98101

     Re:    Children and Family Justice Center
             COJK Reference:  KCAO-5-55031

Dear Mr. Rava:

I write in response to your letter of May 13, 2020, in which you requested that by May 29 my client provide a proposal that reflects a commitment by King County "to stop using the terms Children Family Justice Center and CFJC."  Respectfully, and to be clear, King County has never committed to stop using the terms Children Family Justice Center or CFJC.  And because we believe as the USPTO does—that your client has no enforceable rights in either mark at this time—King County cannot and will not commit to such a course.

Your May 13 letter makes clear a number of significant points only obliquely touched upon in the draft complaint you provided to us previously, and all of these points underscore that King County is well within its rights to continue its use of the terms Children and Family Justice Center and CFJC as it has for years.[1]

---

[1] I am not sure I understand your objection to our point that the name of the facility has been established by ordinance and it would require an amendment of that ordinance to rename the facility.  You mention that the ordinance does not explain why the facility was named as it was.  This is a non sequitur.  Our point was simply the procedural point that the name of the facility cannot be officially changed without the King County Council changing the ordinance naming it.

T 206.682.8100    COJK.com    1201 Third Avenue
F 206.224.0779              Suite 3600
                             Seattle, WA 98101-3029             [Your Innovation Partners]

William C. Rava
May 22, 2020
Page 2

As an initial matter, your letter establishes that your client "of course has no objection to King County using the name Patricia J. Clark on its new jail.  The problem, rather, is the 'Children and Family Justice Center' part of the name.'" You are aware that King County has been using these terms to describe the facility since 2015.  Indeed, taking the allegations of your draft complaint as true, your client has been aware of King County's use of the terms "Children and Family Justice Center" and "CFJC" since at least December 2016.  King County finds it troubling that your client would sit on any rights it might have had in the marks for years (and we believe there were none), then wait to assert its alleged rights when concerns affecting the public health and safety have never been greater.

Additionally, your letter explains that King County is using these terms to describe "its new jail."  Apparently to drive the point home, you refer to King County's facility as a jail no less than five times in less than two pages.  We are aware of no authority that establishes a local government's prison system as "interstate commerce."  As such, we fail to appreciate how your client can establish King County's long-standing descriptions of "its new jail" as use of any mark in commerce at all.

We have approached negotiations with an open mind.  However, based on the office actions issued by the Trademark Office on the subject marks, we are no longer inclined to recommend a name change to our client.

Finally, we simply disagree with the position you take in your footnote regarding your client's ability to overcome the USPTO's rejection of Northwestern's trademark applications.  At best, the terms your client seeks to register are descriptive in nature.

We believe this correspondence should conclude the matter.  We are grateful for your civility in our discussions to date.  If you believe there are other issues beyond those addressed herein that still require our attention, however, please let us know at your earliest convenience.  Absent further correspondence, we consider the matter closed.

Sincerely,

CHRISTENSEN O'CONNOR
JOHNSON KINDNESS PLLC

John D. Denkenberger
Direct Dial No.:  206.695.1749
E-Mail Address:  john.denkenberger@cojk.com

JDD:bfm/snh